RIVER FOREST STATE BANK AND TRUST COMPANY, as Trustee Under Trust Agreement Dated December 7, 1992, and Known as Trust No. 3880, Plaintiff, v. ROSEMARY JOYCE ENTERPRISES, INC., *et al.*, Counterdefendants-Appellees (Ashley B. Corporation, Counterplaintiff-Appellant; First National Bank of Chicago, Defendant).

First District (5th Division)   No. 1—96—3335

Opinion filed December 12, 1997.—Rehearing denied January 28, 1998.

174

Matthew M. Klein, of Hinsdale, for appellant.

Wolin & Rosen, Ltd., of Chicago (Harold Rosen, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Ashley B. Corp. (Ashley) appeals from the circuit court's judgment favoring Lyn-Jay Homes, Inc. (Lyn-Jay), and Rosemary Joyce Enterprises (Rosemary), appellees. The litigation was initiated by River Forest State Bank and Trust Company (River Forest), which filed a declaratory action as trustee of a land trust holding title to a parcel of vacant land located in Westchester, Illinois. Ashley, Lyn-Jay, and Rosemary were beneficiaries of the trust. Among other

things, the action sought directions as to the trustee's responsibilities regarding the proposed disposition of the trust property. Lyn-Jay filed an answer and counterclaim and, subsequently, sought temporary and preliminary injunctive relief. Rosemary filed a "motion" for declaratory judgment, later amended to a complaint for a preliminary injunction.

By an agreed order entered March 8, 1996, the parties were directed to take certain steps to wind up their business relationships and dispose of their assets. Ashley was ordered to file pleadings stating all its claims to any interest and assets in a joint venture involving the beneficiaries, based upon a joint venture agreement earlier entered into by the parties to this appeal. Lyn-Jay and Rosemary were directed to respond to those pleadings. An ancillary trial was held upon those pleadings, resulting in the order from which this appeal proceeds. A Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding was entered by the circuit court upon which our appellate jurisdiction rests.

The issues identified in this appeal include whether the circuit court erred (1) in construing the terms of the joint venture agreement; (2) in finding in favor of Lyn-Jay and Rosemary after Ashley rested, where Ashley purportedly presented a *prima facie* case; and (3) whether an order of sale entered by the court after this appeal was filed should be considered here.

In 1992, Frank J. Barrett secured and paid $35,000 for an option to purchase a 6.155-acre tract of land from its owner in Westchester. Thereafter, Barrett formed a joint venture with Rosemary Joyce and Robert, Fred, Cary, and Henry Erfurth for the purpose of developing and selling the property and, in October 1992, they executed a joint venture agreement.

In December of 1992, the parties placed the land in the instant land trust, with River Forest as trustee. The original three parties each held an undivided one-third interest in the trust. The parties subsequently assigned their beneficial interests to corporate entities owned by each respective party. Specifically, Barrett assigned his interest to Ashley, Joyce assigned her interest to Rosemary, and the Erfurths assigned their interests to Lyn-Jay.

Following the establishment of the land trust, on December 22, 1992, the parties executed a new joint venture development agreement (December Agreement) that superseded the October 1992 agreement, and changed the name of the venture to the Rosebrook Joint Venture. The December Agreement again authorized the joint venture purchase of the 6.155-acre parcel, under section I.6.C., and, under section I.6.D., provided that "[t]he purchase price shall be

$725,000 minus the $35,000 capital already paid by \*\*\* Barrett. Rosemary \*\*\* and Lyn/Jay will each contribute $345,000 toward the purchase price balance." The December Agreement also set forth Barrett's assignment of all his right, title, and interest in the option contract to the joint venture partners. Section I.6.H. of the December Agreement stipulated that the fair market value of the real estate was $725,000.

Section I.6.I. directed:

> "Frank J. Barrett shall be reimbursed equally by the other two (2) parties to the joint venture for 2/3 of his ascertainable pre-closing expenses to date ($24,136.55) and his $35,000.00 capital contribution which were paid to bring the project to its current condition. All further expenses from this date forward are to be shared and allocated equally between the three entities. Such capital and expense reimbursement shall take place at the same time of any expense reimbursement."

Further, section I.6.H. provided, in part:

> "In the event, contribution of the Real Estate is subject to existing taxes and/or liens at the time of contribution to the Land Trust, and a Joint Venture party advances monies to the Joint Venture for the payment of real estate taxes, mortgage payments or other liens or costs that currently affect the premises, the Contributing Party shall be credited with same as a capital contribution."

Under section II.3., Lyn-Jay:

> "as Developer shall contribute its own services as a general contractor or obtain the services as of such third parties (hereinafter referred to as 'Subcontractors') as it chooses to undertake the Development of the Property."

Section II.6. of the joint venture agreement stated, in part:

> "It is further understood that Lyn-Jay, Barrett and Joyce, as parties to the Primary Joint Venture, shall share equally in the proceeds from: any lease income and/or from the sale of the partially or fully developed parcel earned by the Primary Joint Venture and/or with the Secondary Joint Venture as co-venturers."

In addition, the December Agreement in section III.2. read, in part:

> "Profit: The three entities shall share equally all profit generated by either the development or disposition of all or part of the entire 6.155 acre tract. Profit is defined as the remainder of revenue minus a pro rata return of each party's investment of capital to the project which shall include an interest rate of return from the date of each capital contribution at a rate of return of 2% over the prime rate as published in the Wall Street Journal."

Nothing in the December Agreement suggested that Barrett's $35,000 or any services he might perform were to constitute capital contributions equivalent to the $345,000 each of the other parties contributed, nor was any other value ascribed to such service, if any.

The circuit court's construction of the foregoing December Agreement provisions is the crux of the instant controversy.

In 1993, both Lyn-Jay and Rosemary made loans to the joint venture in order to finance initial construction expenses. On December 21, 1993, the three parties assigned their beneficial interests to The First National Bank of Chicago (First National) as security for a construction loan of $600,000. From that loan, the joint venture, in January 1994, reimbursed Lyn-Jay and Rosemary in full for previous loans they made to the joint venture.

On February 10, 1994, Ashley assigned its beneficial interest in the land trust, which was already subject to the collateral assignment to First National, to Lyn-Jay as security for a personal loan in the amount of $40,000.

The joint venture's income tax return for 1993 showed the interests of the three venture parties to be "33.33%," and characterized the original cash commitments as mortgages, notes, and bonds. Barrett disagreed with this characterization of the cash commitments and, on behalf of Ashley, wrote a letter to the joint venture's accountant stating he believed that the original cash commitments should be characterized as capital contributions.[1]

On December 18, 1995, Lyn-Jay, Rosemary, and First National directed River Forest to sell the frontage of the land to World Savings and Loan, a California bank. The following day River Forest received a letter from Barrett revoking Ashley's February 1994 assignment to Lyn-Jay.

On December 22, 1995, River Forest filed its declaratory action, seeking to ascertain the effectiveness of the various assignments and Ashley's revocation. Lyn-Jay filed its answer and emergency motion for a temporary restraining order, injunction, and declaratory relief on December 29, 1995. After a hearing on January 2, 1996, the circuit court ordered the sale of the frontage portion of the land to World Savings Bank for $750,000, in accordance with the December 18, 1995, direction of Lyn-Jay and Rosemary to convey, approved by First National. The court ordered that the sale proceeds be distrib-

---

[1]Although the characterization of the initial cash commitments was originally disputed, it appears that the three parties now agree that all original cash commitments to the venture are to be considered capital contributions.

uted, first, to First National to pay off the original loan, and, second, to pay various contractors' and materialmen's expenses incurred by the joint venture. Last, the court ordered that the balance be distributed to the joint venture's parties to pay further expenses and certain of their respective claims.

In accordance with the March 8, 1996, agreed order, Ashley was required to file its pleadings with respect to all its claims regarding the joint venture, its partners and its assets. Lyn-Jay was granted leave to file its counterclaim and Rosemary was granted leave to file its amended counterclaim. By an agreed order presented on March 18, 1996, entered on March 20, 1996, *nunc pro tunc* March 18, 1996, the Rosebrook Joint Venture was dissolved and its affairs ordered to be wound up. Matters upon which the parties could not agree were to be presented to the court for determination. As part of the wind-up, the court ordered that the joint venture should attempt to sell any residential projects then under construction.

Ashley filed a counterclaim, as its pleadings, in which it asserted that the joint venture should be dissolved; Ashley be declared owner of a one-third undivided interest in the land, which land should be partitioned; that a receiver be appointed; and an accounting ordered for proceeds of sales and for its ownership in the capital of the joint venture.

A separate bench trial was set for Ashley's pleadings and Lyn-Jay's and Rosemary's responses thereto. River Forest, the trustee, was excused by the court from participating in this proceeding. Only Barrett testified at trial, describing the history and development of the joint venture and the continuing dispute between the parties. His construction of section II.6. of the December Agreement provided for an equal division of the land sale proceeds. Although the $35,000 Barrett paid for the option was his only cash capital contribution, he claimed a total contribution of $345,000, the same amount as each of the other two parties, maintaining that the land, with modified zoning and the eventual development of the property, was worth considerably more than the $725,000 purchase price.

On cross-examination, Barrett testified that section III.2. of the December Agreement applied only to the sale of "residential unit[s] constructed upon the property," but did not apply to the disposition of the parcel of land itself.

At the conclusion of Barrett's testimony, which also marked the end of Ashley's case, Lyn-Jay and Rosemary successfully moved for a finding in their favor under section 2—1110 of the Code of Civil Procedure (735 ILCS 5/2—1110 (West 1994)). The circuit court ruled that the joint venture agreement was "clear and unambiguous"; Barrett's

interpretation of the agreement was "strained"; and section III.2. applied also to the distribution of money from the sale of the land as well as from the residential units constructed on the property. The court further found that Ashley had made capital contributions of only $35,000, the cost of the option, and $24,136.55, the preclosing expenses. The court entered a formal order, encompassing the foregoing determinations, on May 2, 1996. Ashley appeals.

I

Ashley first contends that the circuit court erroneously rewrote the December Agreement under the guise of holding it unambiguous and erred specifically in its construction of sections II.6. and III.2.

■ The primary object of contract construction is to give effect to the intention of the parties. *Srivastava v. Russell's Barbecue, Inc.*, 168 Ill. App. 3d 726, 730, 523 N.E.2d 30 (1988). (*Srivastava*). The rules of contract construction require that intention should be ascertained from the language of the contract; clear and unambiguous terms must be given their ordinary and natural meaning; contracts will be interpreted as a whole, giving meaning and effect to each provision thereof; contracts imply good faith and fair dealing; and when an instrument is susceptible of two constructions, an interpretation that imputes bad faith to a party or is inequitable will be avoided. *Srivastava*, 168 Ill. App. 3d at 730.

■ Ashley asserts that section II.6. of the December Agreement applies to the sale of the subject property and section III.2. applies only to the sale of residential units built on the property. Contrariwise, Lyn-Jay (whose brief and argument on appeal were adopted by Rosemary) maintains that section III.2. applies to all dispositions of the subject property, whether developed or undeveloped, and that section II.6. applies to dealings in which the joint venture is a "co-venturer" with a secondary joint venture, should such an additional venture be formed. The language of section III.2. expressly refers to the "disposition of *all or part* of the entire 6.155 acre tract." (Emphasis added.) The language of section III.2. does not limit its provisions merely to the sales of constructed residential units, but specifies that all profits "generated by *either the development or disposition*" of the land will be shared equally. (Emphasis added.)

Ashley insists, however, that if section III.2. is read to apply to all dispositions of the land, then section II.6. is eliminated from the December Agreement. Section II.6. is not eliminated under this construction; it simply applies to proceeds generated by the joint venture as a co-venturer in the event another partnership or business enterprise were to become involved, an eventuality which never came to pass.

Ashley's interpretation also runs counter to long-standing partnership distribution laws contained in the Uniform Partnership Act (Act) (805 ILCS 205/1 *et seq.* (West 1996)) and case law. In *Bachewicz v. American National Bank & Trust Co.*, 111 Ill. 2d 444, 448, 490 N.E.2d 680 (1986), and in *Dremco, Inc. v. South Chapel Hill Gardens, Inc.*, 274 Ill. App. 3d 534, 654 N.E.2d 501 (1995), the courts held that the Act applies to joint ventures. The Act provides, in pertinent part:

"Settlement of accounts between partners. In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

(a) The assets of the partnership are:

I. The partnership property,

II. The contributions of the partners specified in clause (d) of this paragraph.

(b) The liabilities of the partnership shall rank in order of payment, as follows:

I. Those owing to creditors other than partners,

II. Those owing to partners other than for capital and profits,

III. Those owing to partners in respect of capital,

IV. Those owing to partners in respect of profits.

(c) The assets shall be applied in the order of their declaration in clause (a) of this paragraph to the satisfaction of the liabilities." 805 ILCS 205/40 (West 1996).

Under Ashley's construction of the instant December Agreement, the proceeds of any land sale would be divided evenly, as profits, without payment first to settle the parties' capital accounts, contrary to sections 40(b)(III) and (b)(IV) and 40(c). Nothing in the agreement suggests that the Act was to have been modified in this way. Indeed, section III.2. of the December Agreement takes account of each party's contribution of capital in the definition of "profit," which requires that the *pro rata* return of each party's investment of capital be made before distribution of proceeds is made from the disposition of all or part of the subject property.

The circuit court's construction of the foregoing provisions was correct.

## II

Ashley next contends that its capital contribution was not limited to the $35,000 option, but was $345,000, an amount equal to the cash contributions of Rosemary and Lyn-Jay, because the value of Ashley's concept of how the land should be developed and Ashley's right to exercise the option must be considered part of Barrett's, therefore Ashley's, capital contribution, rather than being limited to $35,000, the cost of the land option.

■ The December Agreement expressly contemplated a capital contribution from Ashley of $35,000 and payment of $24,136.55 in preclosing expenses, under section I.6.I. Ashley also may have contributed another $1,000 to the joint venture, for a total of $60,136.55. Ashley has presented no evidence to the effect that the development concept was an independently valued contribution, nor can any such provision be found in the Agreement. There is no evidence to suggest the option to buy the subject property carried any value over the $35,000 cost of the option itself. There is no showing that any of the other parties recognized an equivalent contribution of $345,000 from Ashley. Significantly, the December Agreement established that the fair market value of the land was $725,000, the sum of Lyn-Jay's $345,000, Rosemary's $345,000, and Ashley's $35,000, and mentioned no other assets. Nothing was designated by the Agreement to account for Ashley's missing contribution of $284,863.45, in order to support its claim of equivalency.

Ashley urges that because the land value increased after the joint venture's purchase (the commercial frontage was eventually sold to a bank for $750,000, and First National loaned $600,000 to the joint venture to develop the rear residential portion), the fair market value of the land was grossly underestimated, which somehow rebounded to increase Ashley's capital contribution credit upon dissolution. An increase in land values after the purchase relates to profit; it does not equate to a greater cash capital contribution before the purchase, unless the parties choose to treat it so. Here, the parties knew how to provide for increases in capital contribution credits. They provided for such an increase only in section I.6.H., and that increase concerns payment of "real estate taxes, mortgage payments or other liens or costs that currently affect the premises," none of which are involved in Ashley's theory.

Ashley relies upon *Becker v. Killarney*, 177 Ill. App. 3d 793, 532 N.E.2d 931 (1988) (*Becker*), as support for its argument. In *Becker*, seven people entered into a partnership agreement to operate a hotel, five of whom agreed to contribute only their services to the partnership and two others, who joined the partnership later, agreed to contribute cash. The partnership agreement itself recognized that service contributions by some of the partners were to be treated as equivalent to the cash contributions of the others. Also, the service partners each continually performed their prescribed services according to their skills throughout the partnership's operation of the hotel venture. The hotel lost money and, when the losses mounted, the service contributors sought reimbursement from the cash contributors to share the losses equally. The cash contributors argued that their

contributions should be applied to the losses before they paid more money into the partnership. *Becker*, 177 Ill. App. 3d at 795. The appellate court explained that the agreement required services to be recognized and capitalized "so as to prevent unjust enrichment." *Becker*, 177 Ill. App. 3d at 798. Ashley claims *Becker* establishes that, if profits are shared among partners, then their respective capital contributions are automatically equal as well.

Ashley extends *Becker* too far. In *Becker*, the court merely held that, to prevent the unjust enrichment of cash contributors at the expense of service contributors, losses had to be shared equally among both service and cash partners, *as contemplated by their agreement*. *Becker*, 177 Ill. App. 3d at 796-98. In the instant case, the circuit court did not hold that services could not be a capital contribution, but found no provision in the agreement for such a service contribution in lieu of cash, and inferentially determined that Ashley did not make such a service contribution. There was no error in the court's interpretation of the December Agreement in this respect.

## III

■ Ashley next contends that the circuit court erred in refusing to find that Ashley was entitled to a capital contribution expense reimbursement of $19,700 from Lyn-Jay and Rosemary each, under section I.6.I. of the December Agreement.

Under section I.6.I., all parties were to contribute equally to the expenses of the joint venture. The parties agree that reimbursement of capital expenses to Ashley was to come at the same time as any other expense reimbursement. Lyn-Jay and Rosemary each received a reimbursement in January 1994, for initial loans they made to the joint venture, which were in accordance with the joint venture agreement.

At trial, Barrett conceded that Ashley did not share the expenses equally, but that "[Lyn-Jay and Rosemary] made loans to the Rosebrook Joint Venture to earn interest." Lyn-Jay and Rosemary argue that, because Ashley did not pay its share of those expenses, it should not be reimbursed under section I.6.I.

Although it is undisputed that Ashley never shared equally in the expenses of the joint venture, the language of section I.6.I. clearly and unambiguously requires that Lyn-Jay and Rosemary were to reimburse Ashley for two-thirds of Ashley's capital contribution of $35,000 and preclosing expenses of $24,136.55 "at the same time of any expense reimbursement." Under the language of that section, such reimbursement does not require that Ashley share in further expenses, nor does it state that the sharing of further expenses was a

condition for Ashley's reimbursement of "ascertainable pre-closing expenses to date *** and his capital contribution." Additionally, Lyn-Jay and Rosemary did not demand that Ashley participate equally in further expenses.

Section I.6.I. was designed to protect the three parties from paying disparate amounts of money in expenses and to insure that the expenses would be shared equally by the three joint venturers.

The circuit court erred in denying reimbursement to Ashley as required by section I.6.I., and this part of the judgment must be reversed and remanded for further proceedings.

### IV

Ashley next contends that the circuit court erred when it entered judgment in favor of Lyn-Jay and Rosemary at the close of Ashley's case, because it presented a *prima facie* case with enough evidence of ambiguity to require the case to have gone forward.

■ In a bench trial, where defendants move for judgment in their favor at the end of the plaintiff's case in chief, "the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence," and rule accordingly. 735 ILCS 5/2—1110 (West 1994). Section 2—1110 acknowledges that where the circuit judge is the trier of fact, defendants should not be required to put on their case when the court would rule for defendants at the close of plaintiff's case. There is a two-stage procedure inherent in section 2—1110. At the first stage the circuit court determines whether plaintiff has made out a *prima facie* case, in other words, whether "he has *** presented at least some evidence on every element essential to his action." *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154, 407 N.E.2d 43, 45 (1980). If he has not, defendants are entitled to judgment as a matter of law. *Kokinis*, 81 Ill. 2d at 154-55. If "plaintiff has made out a *prima facie* case" (*Kokinis*, 81 Ill. 2d at 155), then at the second stage the circuit court views the case in the same manner as it would had defendants rested at the close of plaintiff's case (*Kokinis*, 81 Ill. 2d at 158, 407 N.E.2d at 46 (Ryan, J., specially concurring)). At the second stage the court may enter judgment for defendants or it may deny defendants' motion and allow the trial to proceed. When such a section 2—1110 motion is made, the court weighs plaintiff's credible evidence against the credible evidence presented by defendants. The fact that plaintiff has presented some credible evidence case does not require denial of defendants' section 2—1110 motion, where the court's evaluation of the evidence requires entry of judgment for defendants. The court's ruling on a section 2—1110 motion will not be overturned unless it is against the

manifest weight of the evidence. *Zannini v. Reliance Insurance Co. of Illinois, Inc.*, 147 Ill. 2d 437, 449, 590 N.E.2d 457, 462 (1992).

Ashley contends that it presented enough evidence to establish a *prima facie* case demonstrating that the December 1992 joint venture agreement was ambiguous. First, Ashley notes Barrett's testimony that section II.6. applied to the sale of land and that section III.2. applied only to "dispositions" of residential projects. Barrett also testified that he regarded his capital contribution as having been $345,000, equal to that of Lyn-Jay and Rosemary, based upon documents such as the December Agreement, which stated that each party had a "1/3" interest in the joint venture; the joint venture's federal income tax schedule K-1, which listed the interests of the three parties as "33.33%"; and the land trust agreement, which gave each party a one-third interest in the land trust. He concludes that because he is entitled to one-third of the profits (or share in any losses) he is entitled to one-third of everything his partners contributed to the joint venture.

■ The circuit court's decision to the contrary was not against the manifest weight of the evidence. First, the court found Barrett to be an incredible witness, a finding it is permitted to make with a motion for judgment in a bench trial. The court also considered the language of the December Agreement itself, determined the intention of the parties through the language it used, and examined the Agreement as a whole (*Srivastava*, 168 Ill. App. 3d at 730), as well as the other documents mentioned.

Although the December Agreement and other documents specified that each party was to own "1/3" of the interest of the joint venture, Barrett testified that the $35,000 was his only capital cash contribution and the agreement did not recognize any other value for Barrett's development concept, option, or any other involvement or services which could be considered capital contributions returnable to him upon dissolution.

The circuit court correctly entered judgment for defendants at the close of Ashley's case.

V

In a motion filed in August 1997, Ashley requested this court to supplement the record with an order of sale entered by the circuit court on December 6, 1996. This order issued after Ashley filed its appeal with this court on September 19, 1996.

■ Ordinarily, a court of review cannot consider matters that occurred after the filing of the appeal that are not in furtherance of the appeal (*Atkins v. Atkins*, 393 Ill. 202, 206, 65 N.E.2d 801 (1946)), but

will not apply this rule if it would produce absurd results or injustice. *Hazdra Homes, Inc. v. County of Du Page*, 27 Ill. App. 3d 685, 687, 326 N.E.2d 561 (1975).

Ashley argues that the December 6, 1996, order of sale is in conflict with the circuit court's final order of May 2, 1996. To the contrary, the order simply determines the balance of the wind-up process and the rest of the pending matters. The order directs that property owned by the joint venture partners through the River Forest trust, which had not been sold up to December 6, 1996, was to be sold at a sheriff's sale, under conditions prescribed by the order, and that the proceeds be distributed in accordance with the capital contributions of each of the partners, which was set forth. The December order is neither necessary nor germane to the issues involved in this appeal. Accordingly, leave to make that order part of the present appeal record is denied and references thereto in any subsequent brief are stricken.

Although the circuit court also dismissed Ashley's claims for an accounting, receiver, and partition, those issues have not been presented for review on appeal.

In summation, the circuit court's construction of sections II.6. and III.2. of the December Agreement, and its determination of the parties' capital contributions, are affirmed. The circuit court's determination that Ashley is not entitled to reimbursement under section I.6.I. of its capital contribution and preclosing expenses, as well as Ashley's further contribution of $1,000, is reversed, and the cause is remanded for further proceedings as to this issue.

Affirmed in part, reversed in part and remanded with directions.

HOURIHANE and SOUTH, JJ., concur.